2010, 5026. Mr. Axelrod. Thank you. Good morning. If it pleases the Court, this is not a case in which there was a mistake made in the drafting of the language that was signed by Congress adopting the Covenant subject to later proceedings. This is a case in which that document embodied what the deal was at that time, and to understand why no mistake was made, you have to have an understanding of the context of the deal. What I call the deal was an agreement, the agreement embodied in the Covenant between the Chamorro and Carolinian people who were the indigenous citizens of the Northern Mariana Islands and the United States. And in the context of that deal, at the time of the deal, the Carolinian and Chamorro people were then citizens of the Trust Territory of the Pacific Islands, along with citizens, all of whom were aliens to the United States, of the islands of Chuuk, Pohnpei, the Marshall Islands, and the like. The negotiation that's embodied in the Covenant was a separation of one part of the peoples out of the Trust Territory, the Chamorro and Carolinians, who were, as I said, the citizens, the domiciliaries of the Northern Mariana Islands, and their separation and a redefinition of their position correctly. Because the Court of Claims went through a large number of things, the first of which, as I understood it, was 606, get lost in the statutory provisions, but the 606B. And her conclusion at the end of the day with respect to just that statutory provision, as I understood it, was even though it just says excise taxes for employers and another category for self-employed, and doesn't talk about FICA for employees, that would be an absurd result to not suggest that that particular provision includes employees. You seem not to take issue with that. I just want to make sure I understand what your argument is. So you would agree that employees, in general, would fairly construe 606B to include employees. You say, however, that with respect to non-resident aliens, none of that should apply. It shouldn't apply to employers or employees because of other provisions like 19 etc. Am I right about that? No. So tell me where I'm wrong. Our position with respect to 606 as a whole, including 606B, is that that provision applies only to the citizens and domiciliaries of the Northern Mariana Islands who will become citizens, who it was anticipated would become citizens upon the termination of the trusteeship agreement. Fair enough. But does your description of citizens, talking about 606B, citizens include employees other than non-resident aliens? Citizens. You're saying that you accept the district court's reading of 606B to include employees as long as they're citizens. No. Because 606B does not address of itself the application of FICA taxes to any employees. When the domiciliaries and citizens of the Northern Mariana Islands become citizens of the United States, those FICA taxes will apply through 3121A and 3121B of their own effect because they are citizens of the United States. And so it applies to them whenever they are working for an American employer. And I read 606B to say, with reference to the employer tax, that employers of U.S. citizens in the Northern Mariana Islands will be considered American employers. Mr. Axelrod, why doesn't 601C cover your clients? References of the Internal Code to Guam also refer to the Northern Mariana Islands. Because section 601C is part of section 601, and 601 is addressed solely to the application of income taxes and what income... That's what 601A says, but the heading for the article says revenue and taxation, which is broad. But that provision has been interpreted by the Ninth Circuit, as I'm sure the Court is well aware, in the Armstrong decision to apply only to income taxes and only to direct the CNMI legislature to adopt, as its local territorial income tax, a mere code of the IRC. And in Armstrong, the Court interpreted 601C and counseled very strongly that one cannot use these same-as-Guam clauses or substitution phrases to apply a broad range of federal laws to the CNMI because that was not the drafter's intent. What about 502A2, which also has the Guam reference? 502A2 does not apply to this circumstance for a host of reasons, which we go through in our brief. There's just a series of inconsistencies, beginning with the first step, which says, except as otherwise provided in the covenant. Well, one of the main provisions, as otherwise provided in the covenant, is Article VI, and what are going to be the income tax rules, and what most important, or very importantly, is going to be the situation with the citizens and domiciliaries of the Mariana Islands with respect to the social security laws. What are they going to do to support them? What benefits are they going to get out of that? This was a major part of the, quote, deal, as we refer to it, the covenant, that moved the Marianas out of the trust territory, the Pacific Islands, into this unique relationship with the United States. It was a negotiated deal, as you can see from the history of the negotiations and the period after implementation. It was signed off at a time when there was a substantial amount of uncertainty as to what Congress would ultimately elect the form of the relationship to be. A major part of that negotiation involved giving the citizens a step up and credit for their contributions to the trust territory retirement fund, and there was concern at that time, through the negotiations up to writing the covenant, about whether or not the employee tax would apply, and if so, how much, and would it be brought in step by step, because relative to the wage levels out there, it was a significant burden. I think a very key component in understanding this context is to watch the change from Draft 5, December 1974, to the agreement that Congress actually sent out to be voted on by the people of the Northern Mariana Islands. Draft 5 says Title II benefits and the FICA taxes will apply. That draft was never submitted to the people of the Northern Mariana Islands for the referendum. Instead, it was changed after that draft was referenced to Congress, and what comes back is very different. It expressly excludes, by changing 606C, all the trust territory people. They were included before. If you were in Truk or the Marshall Islands under Draft 5, if that were adopted, you could relocate to the CNMI, and you would then get these stepped up benefits. Congress didn't want that. This was a deal that was to benefit the local indigenous people who were going to become citizens of the United States, so when they went from Draft 5 to the final draft that was actually submitted for a vote, they excluded everybody but domiciliaries of the Northern Mariana Islands who were previously in the trust territory retirement fund. They dropped expressly any reference or language that included the employee tax. It was a hot-button item. Congress, as you can see from the legislative history, had not determined how it was going to apply these, and they knew that Section 606 was not going to be effective until sometime down the road. When you say they dropped it and it was a hot-button item, what evidence is there that this was focused upon at all, other than the fact that the word employee doesn't appear in that section? If you look in the section-by-section analysis of the Mariana Political Status Commission, the Mariana Political Status Commission was the group that was appointed by the trust territory government to be the negotiating representative for the Chamorro and Carolinian peoples. It speaks for them. I submit to you that when it talks about the people of the Northern Marianas, it's talking about those citizens and domiciliaries. In the discussion of 606, you see that there is a substantial concern for the impact that that will have. It's referenced in the Senate report. I believe it's at pages 66 and 67 of the Senate report. But what is there that actually says, we have a problem with the imposition of FICA tax on employees, please take it out, or some rough analog to that sort of statement? Is there anything? There is, in the Senate report, a direct reference to the fact that the Mariana Political Commission has told them that we have to continue looking at this because the tax is too burdensome relative to the wage levels. Where is that? We have that material. Yes, I believe it's in addendum B-15, and it's at page 60 and or 66 and 67. But I believe it's page 60. Page 60? Yes. 6-0. And so that was one of the concerns. And so when you see this change, this specific direct change from Draft 5 to what was actually submitted to the people of the Northern Marianas, subject to the proviso that everyone knew that Congress had full authority under the covenant, under Section 105, to later decide whatever it is it wanted to do, I submit to you that you can't find that the decision not to refer in this context to the employee tax was anything but deliberate. Getting back to your earlier question, Judge Prost, as to what our position is with respect to the employees, it didn't need to be mentioned there because as restricted to the citizens who will become citizens of the United States, upon that effective date, the FICA employee tax will apply to them through 3121A or B, and if they are working for an American employer, which is how we interpret that provision, so it didn't need to be addressed separately. Mr. Axelrod, you're into your rebuttal time. Okay, then I'll reserve my time. Thank you. Mr. Taffey? Taffey, Your Honor. Taffey. May it please the Court, taxpayers argue that they're not required to pay the employee portion of FICA taxes, and to me this creates two broad mysteries that with the Court's indulgence I'd like to discuss briefly because I think it actually can cut through a lot of the legislative and statutory thicket that goes on here. The first mystery is why is the corporate plaintiff a plaintiff? We've never gotten an answer to this. This is Hunjin Corporation, who is an employer, who is explicitly covered under Section 606B of the Covenant, and yet they're seeking $1.4 million in refund. We discussed this mystery a little bit in our answering brief. I don't think they addressed it at all in their reply brief, and it's never been clear to us why this is in controversy at all. If there's anything in controversy, it's only the employee portion, and we don't see how that has anything to do with the corporate plaintiff. So that's one mystery. But the second one really gets to the heart of what the taxpayers have been arguing about, and this is where I think I can cut through some of what's been going on here in a pretty straightforward way. The mystery here is what are we to make of this apparent exclusion of a word that one would otherwise expect to be there? That is, in Section 606B, it's not the case that they said that employer taxes and self-employed taxes will apply and self-employed taxes will not apply. They never got the word employee. Right. The question is why. Right, right. But they didn't deliberately – they didn't give any sense that they did so intentionally. They didn't actively say that it's not there. It's just not there, and so that's the mystery. Yeah, but that's a significant omission. I agree. Nothing applies unless Congress directs it. Absolutely. I agree. That's why I think there's – but nonetheless, it's something that had not ever been done before. If they're right, this is a distinction that Congress has never made before in the history of Social Security, so the question would be why, and they have some answers, but I have a modest proposal, if you will, about why just looking at the text of 606B, that may not have been their intent at all, and Congress may actually have thought in 606B that they were covering employee taxes, and we may be arguing a lot about nothing. The reason relies a little bit on legislative history, and realize that's a strange thing to say, but you'll see why. In the legislative history is uniform. As the Court of Federal Claims found, the documents are uniform, demonstrating that all FICA tax provisions were to apply in the Marianas Islands. Before the covenant was ratified, the House and the Senate report said that subsection 606 assures that the laws of the United States which support – which impose taxes to support the Social Security system will become applicable. The laws. That was in the House and Senate report, which came after this whole drafting change that opposing counsel just finished talking about. Likewise, the section-by-section analysis that the Marianas Political Status Commission conducted, which parenthetically the Ninth Circuit has held to be authoritative in this context, had exactly the same language. That's where Congress got the language. It said the laws that support Social Security taxes will apply. So one would have thought that the laws will apply includes all of the laws, since this is – the employee portion is a major portion of the support. Then, of course, we have the mysterious language of 606B, which just says excise taxes. But the covenant also included section 504, which instructed the United States to create a commission to review the effect of the covenant between the time it was ratified and the time it would take effect about 10 years later to figure out, are we going to mess anything up just by enacting the covenant as it is? Because it's a complicated thing, integrating an insular territory like this. And they took a couple of years. They issued two interim reports. And in the second interim report, which was issued in 1985, seven or eight years after this thing was ratified, they said in the summary portion employers and employees in the Northern Mariana Islands are made subject to taxes imposed by the Federal Insurance Contributions Act to support the federal Social Security system. And opposing counsel denigrates this as kind of a stray remark, but this commission's sole role was to go through this covenant with a fine-tooth comb and to figure out what it currently does. And if it does something wrong or doesn't do something, how should we change it? Can I just interrupt you there? What I'm struggling with, so maybe you can focus it on, is a little more pedestrian, I guess, than where you are, which is, as you heard, I don't know if you were here for the first argument, but we were all over ourselves in terms of legislative history and when it's considered and when it doesn't. What is the government's view for why we get to legislative history? In other words, my understanding of what the Court of Federal Claims did in a very detailed, comprehensive opinion is, say, to not read employee in the statute. It's not in the statute. Clear reading is it's not. But that would lead to absurd results. So you can agree or disagree with me. It seemed to me that the principle of how when you use legislative history seemed to be, at least in her mind perhaps, given that this would be an absurdity, that's going to lead us to be able to go to legislative history to try to discern did these guys really mean to create this absurd first-time system. Is that your read and is that the government's view then that that's what allows us the hook to legislative history in light of clear language? I would and will defend that view in a second. But your question is actually getting exactly to the heart of where I was going because the view of legislative history that I was about to propose is that legislative history suggests that, in fact, the word excise tax in 606B might not mean what we've been assuming that it means. So the word... Go ahead. Okay, sure. I know where you're going. Yeah, if you look at actually the interim, second interim report, which is on page A179 of the appendix, this is the summary where they're talking about what should be changed and what shouldn't. There's a section called Employment Taxes, and then it says under that section, employers and employees are made subject. It's the language I just wrote. And we got to thinking and preparing for the argument, well, what is actually the meaning of excise tax? Because 606B doesn't say that employers shall pay. It says that excise taxes shall be levied in essence. And Black's Law Dictionary at the time, 1979, the fifth edition, said define excise tax as a tax imposed on the performance of an act, the engaging in an occupation, or the enjoyment of a privilege. And so to me, the language of excise, meaning the engaging in an occupation, could very easily encompass both sides of the occupation. It's the employer and the employee going together to have an occupational situation. And that is simply employment taxes. So what you're saying is that the term excise is not used as a term of art, as a tax lawyer would often use it to refer to the employer's portion of the tax, but rather was used more broadly to refer to FICA taxes imposed on both employees and employers. It's a little awkward that there's also a reference to the self-employment tax in the government, but I suppose that... This was not an argument that you pressed to the Court of Claims, but you just mentioned it. You're absolutely correct. As we were viewing for this case, we realized that maybe we've all been missing something as it goes along, and that's why I answered your question. You're also missing not answering Judge Post's question, which is never a good idea. No, I'm going to get there next, about the absurdity point. But the absurdity point might not even need to be reached. If we view the word excise as simply meaning the employment relationship... That gives you the hook, the ambiguity hook. It does. It's a textual hook, because excise is not a defined term in the covenant. Or in the IRC. Sure, absolutely. And if we understood excise to speak broadly, then it would make sense of why, in the legislative history, Congress and this commission that appointed always thought that this tax applied if they simply meant it in a broad sense. And I don't have any debate on this subject to point to, but I'd suggest that the very lack of debate on the subject shows why they weren't doing anything controversial here. And the non-controversial thing is to have a system, as the government proposes, that is the same as it is everywhere else. So, given that, I think that's the easiest way to resolve this case, honestly. You don't seem to be relying on the Guam provisions. Well, I do rely on them, but you don't even need to get to the Guam provisions if you approach the cases I just described. The Guam provisions create some timing problems for you, don't they? At least one of them does. They do. I think once you get to sections 502A2, and this is when we get to the absurdity point, in 502A2 and 601C, they kick in at different points. I think my response there would be that clearly 606B and the timing provisions that apply directly to it would govern in this instance. And if we think that 606B is ambiguous, then we have to look to how did Congress think about this problem? I mean, if you think it's explicit, if you think that employees are explicitly excluded, then we lose. Well, no, one could still win if we concluded, as did Judge Miller, that the absurdity rule ought to apply. Well, sure, sure. But we don't think there is an explicit statement here along the lines of employees are not to pay it. That's all I meant by explicit. But if you pull back, we would say, looking at 502A2 and 601C, that is how Congress approached the Mariana Islands situation in a broad sense. And it had language in there about unless there was something that clearly suggested the contrary, we're going to be following the example of Guam in this treaty. And that's how we think that these things kick in. There are a sense of default provisions that we would point to as if we're going to figure out what Congress meant to do, we have the legislative history, we have ambiguity in 606B. So these other sections suggest that you need a clear statement of Congress intending to do something that it hadn't done before, and that's not present. Now, I'm sorry it's taken me so long to get to your question, Your Honor, about the absurd outcome. We think that this would be an absurd outcome for a couple of reasons. The first is... I don't disagree that it might be an absurd outcome. My question went to whether or not as a tool of statutory construction, whether or not a conclusion of absurd outcome then gives you the hook to legislative history. That's the way it works. Yeah, so I guess I'd say we get there both ways. It would be an absurd outcome, but it's an absurd outcome you don't need to reach under a broad definition of excise. And it's an absurd outcome, why? Because you're going to have employees not paying into a system, but some of them getting benefits out. Is that what makes it absurd? That's one of the things that makes it absurd. Another thing that makes it absurd is that this would be a pretty stark departure from how the United States has conducted foreign policy in the following way. There are things called totalization agreements. It might be a totalization, I don't know. But totalization agreements that the United States signs with other countries. They're tax treaties. And many sorts of non-immigrant aliens don't pay FICA taxes, precisely because of these treaties. Now, the plaintiffs in this case, the taxpayers, are not from countries that have those treaties, and that's important, because what a totalization treaty says is if we had one with Korea, that would mean that Korean citizens working in the United States wouldn't pay taxes into our system. And what about employers in those circumstances? Does that go for employers and employees? I don't know the answer. It may depend on the treaty. I don't know the answer. But it would equate them and say that, likewise, if they're American citizens in Korea, you wouldn't pay Social Security taxes there either. What they're proposing that we've done here, we being the United States, is essentially given up any leverage we have to extract a totalization agreement from the Asian nations where the taxpayers are from. They're suggesting that we've essentially thrown up our hands and say, we won't charge your citizens Social Security taxes even though you've made no reciprocal agreement for our citizens. That's a strange result. I don't know of any other time when the United States has done such a thing. And so that also explains an answer to their frequent lament about how this is unfair to the citizen, these aliens who don't make much money. The answer to that is if it's unfair to their citizens, they should negotiate with the United States government a system, a totalization agreement, that says that if you release our citizens from this obligation, we'll release yours. It may seem unfair not to have that sort of agreement, but that's the province of foreign policy, not the province, honestly, of this covenant here. So that's another reason, I think, Your Honor, why this is an absurd result. It's kind of a unilateral disarmament. But the point, ultimately, and the thing that troubles me is that setting aside the excise argument for the moment and setting aside also Mr. Axelrod's arguments about why you don't have to reach this point. If one does have to reach the question of whether one can set aside plain, on its face, plain statutory language, that's a question that the Supreme Court has suggested to us should not, a step that should not lightly be taken, if at all. There are folks up there that would say, no, nunca, never. And, in fact, the government comes in here and says, no, nunca, never, with fair frequency. Yesterday, in a sympathetic case, there was a lawyer from your department who was saying, the policy may be nuts, but the statute is plain, and you can't go behind it. So that's a problem for us, and frankly, it's a problem as well for the Department of Justice to figure out if there's any principled reason other than the individual cases to decide when they make that argument, when they don't. So we get conflicting signals, I'll put it that way. Absolutely. I think that there's no question that Congress could have drafted 606B more clearly, one way or the other. They could have said, this is what we mean by excise taxes. They could have said that we are not imposing employee taxes. But I think the ultimate question, and this is a question that hasn't arisen in 20 years and under this covenant until they, taxpayers submitted it, and in fact, 606B didn't even appear in the refund claim that they sought because apparently they didn't notice it either. It's a, there's no reason to think that this, the omission of that word was intentional in the way that the taxpayer suggests that it is. That's true in light of the lack of an express statement with respect to employees. That's true in light of the potentially broad definition of the word excise. And it's true in light of the legislative history before, during, and after the enactment of this covenant. There's just nothing to suggest any of the concerns that taxpayers have raised. None of that appears in the legislative history anywhere. The only thing that does appear is that Congress thought, by all accounts, that these taxes were there. And so because there is no express statement to the contrary in 606B, I think there's enough room here to where a court would not be trampling on Congress's feet by giving effect to a statute in a not counterintuitive way that appears to be what everybody was trying to achieve but may have been drafted in an inartful manner. Thank you, Mr. Tate. Thank you, Your Honor. Mr. Axelrod has some rebuttal time. Thank you. The government's come in and has asserted a totally new position with respect to excise taxes. There's nothing in the record and there's nothing in any legal authority that we have seen where anyone refers to the employee tax on wages as an excise tax. The employer tax that is paid to support the Social Security problems is routinely referred to as the excise tax and the only excise tax in this context. There's nothing to suggest that Congress was rephrasing customary tax language in this context for the coming... Well, the statute, the two statutes that deal with on the one hand employers and on the other hand employees, the employers said, the tax section says that the employers will pay an excise tax and the employees says the employees will pay a tax and doesn't use the word excise but the fact that the employers tax is said to be an excise tax doesn't mean that the employees tax can't also, at least in a colloquial sense, be considered an excise tax and certainly falls within the general definition of excise. There's nothing to suggest in this legislative history that that's how that term was being used and I would suggest that it's somewhat unique and it's the first time the government's come up with it. With respect to the question about why Hunjin is here, Hunjin does not owe the excise tax on foreign non-immigrant workers in the CNMI because they are not performing wages under 3111 and 3121. And that's the basis just as the fact that these same non-immigrant workers who are lawfully admitted into the CNMI only for work purposes are not subject to the FICA employee tax and they did not recite all the whole legal arguments as he notes in the refund. In the whole realm of things, even under code section 3101, there's this explicit provision for, as the other side said, for these international agreements so as to get employees from other countries out from under having to pay the FICA tax. So you're suggesting that in other countries FICA tax, all of that would not apply to non-resident aliens? No, no, no. I am saying that under 3111 and 3121, Hunjin, as an employer who is operating outside the United States, even if considered, interpreted 606B to make them an American employer, does not pay FICA tax on foreign non-immigrant labor. The Commonwealth of the Northern Marianas is not within the United States for that purpose. This argument has nothing to do with whether the word employer or employee Correct. Excuse me, if I was trying to leap and address so many different things in a short rebuttal, I had gone to the question that Mr. Tafe raised about well, they've never told us why Hunjin is here. The reason Hunjin is here is because under the code, he doesn't, Hunjin doesn't have to pay taxes on non-immigrant labor because he is operating or it is operating outside the United States and is not an American employee. Their legislative history that they want to refer to, you have only the ambiguous Senate reports where they make very clear that with respect to Section 606 and the income tax, the whole realm of what Congress is ultimately going to decide, and my light is blinking so I'll try to stop in a second, that Congress is going to sort that out later. Congress did sort that out later. It sorted it out directly in Public Law 98213 where it addressed specifically what are we going to do if we accelerate the date for making Social Security benefits available to the citizens of the Mariana Islands who will become citizens of the United States. And Congress on its own, apart from the Commission, added what is now Public Law Section 19B which makes very clear in the context of that statute that they are excluding non-immigrant aliens in the NMI from both benefits and burdens under the laws that were subject to that Commission request which includes Title II Social Security benefits. So everywhere that Congress went in the ten years after the adoption of the Covenant and prior to its effective date, everything that Congress did was consistent with saying these people are not part of this program and they are not part of this system on either side, benefit or burden. And the absurd result that the lower court relied upon was the incorrect assumption that these people, Zhang and the employers that employ them, are getting benefits under that program. They are not. They are... But that argument doesn't apply to citizen employees. Correct. So the absurdity does apply with respect to citizen employees. It would if there were no other provision that picks up those people. But as I was pointing out in my response to Judge Crow's questions, those citizens, once they become citizens of the United States, are picked up under 3121. And that's why they are covered. And that issue isn't before the court. Thank you. We'll take the case from the record.